FILED
IN CLERKS OFFICE

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

2009 FEB 18  A 0 35

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| Erroll Tyler and Nautical Tours, Inc., | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. _____ |
| The City of Boston and | ) |
| Edward Davis in his official capacity | ) |
| as Police Commissioner of the City of Boston, | ) |
| Defendants | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

This civil rights lawsuit seeks to vindicate the constitutional rights of grassroots entrepreneur Erroll Tyler to earn an honest living. He has spent the last seven years trying to realize his American Dream—operating an amphibious vehicle tour service in Cambridge called Nautical Tours—only to be thwarted at every turn by irrational licensing laws. Boston now stands in his way, refusing to let Nautical Tours onto its streets without a "sightseeing" license the City refuses to even consider issuing. Tyler, whose tours will simply drive through Boston without stopping, has worn out plenty of shoe leather at city hall trying without success to get someone to explain why he even needs a "sightseeing" license and why the City will not give him one. The only plausible explanation for barring Nautical Tours from the streets of Boston is a desire to shield the handful of existing license-holders from competition.

Boston, however, has no legitimate interest in abridging the rights to earn an honest living and to travel simply to protect an entrenched cartel. Economic liberty is a basic civil right and Boston's unjust "sightseeing" license scheme must be struck down.

## JURISDICTION

1.    Plaintiffs Erroll Tyler and Nautical Tours, Inc. ("Nautical Tours") (collectively, "Plaintiffs") bring this civil rights lawsuit under the Fourteenth Amendment to the U.S. Constitution; the Civil Rights Act of 1871; 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201.  Plaintiffs seek declaratory and injunctive relief against the enforcement of Chapter 399 of the Massachusetts Acts of 1931, which unconstitutionally interferes with Plaintiffs' rights under the Privileges or Immunities, Due Process, and Equal Protection clauses of the Fourteenth Amendment.  Plaintiffs also seek nominal damages of $10 for the violation of their constitutional rights.

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. Sections 1331 and 1343.

## VENUE

3.    Venue lies in this Court pursuant to 28 U.S.C. Section 1391(b) because the Defendants reside in this District and the events giving rise to the Plaintiffs' claims occurred in this District.

## PARTIES

4.    Plaintiff Erroll Tyler is a resident of Medford, Massachusetts.  He is an aspiring entrepreneur who has created and plans to operate Nautical Tours—an amphibious vehicle tour service—to fulfill his dream of small business ownership, provide for his family, employ people in his community, and serve the public.

5.    Plaintiff Nautical Tours is a corporation organized under the laws of Massachusetts.  Plaintiff Tyler is the president and chief executive officer of Nautical Tours.

2

6.    Defendant City of Boston is a municipality organized under the laws of Massachusetts.

7.    Defendant Edward Davis is the Boston Police Commissioner and is sued in his official capacity. Chapter 399 of the Acts of 1931 grants the Boston Police Commissioner final decision-making authority for sightseeing licenses. The statute does not authorize any form of administrative appeal from the Commissioner's sightseeing license decisions.

## STATEMENT OF FACTS

### Plaintiffs Erroll Tyler and Nautical Tours

8.    Plaintiff Tyler is a resident of Medford, Massachusetts. He has seventeen years of experience in the transportation industry in the metropolitan Boston area. He began as a driver with a Boston-based national limousine company and eventually worked his way up to supervisor, trainer, and manager.

9.    Plaintiff Tyler wants to use his experience, knowledge, and many business contacts in metropolitan Boston to launch his own transportation company: Nautical Tours. He has assembled a management team, contacted—and been contacted by — potential investors, and taken all of the necessary steps to ready his business for launch once he secures a Boston sightseeing license or a determination that he does not need one.

10.    Like entrepreneurs everywhere, Plaintiff Tyler hopes his venture will enable him to support his family, employ others, provide his customers with an unforgettable experience, and make his community better off.

11.    Plaintiff Nautical Tours is a Massachusetts corporation that Plaintiff Tyler created to launch his transportation company. Nautical Tours will offer amphibious vehicle tours on the streets of Cambridge and Boston and in the waters of Boston Harbor. The tours will begin and end in Cambridge in Kendall Square. The tours will not stop in Boston to drop off or pick up passengers. Nautical Tours' amphibious vehicles will simply pass through Boston on its public streets like any other private or commercial vehicle.

12.    Plaintiff Nautical Tours intends to enter and exit Boston Harbor from within Boston city limits. The marine portion of each Nautical Tours journey will occur entirely upon federal navigable waterways such as the Little Mystic Channel and Boston Harbor.

13.    Plaintiff Nautical Tours will use state-of-the-art amphibious vehicles called Hydra-Terras, which resemble ordinary buses. A Hydra-Terra is not a DUKW (duck boat), which is an open-air military vehicle that is sometimes used in the tourism industry and is prominent in the Boston area. Hydra-Terras are the only Coast Guard-certified amphibious vehicles on the market, and each Nautical Tours Hydra-Terra will be under the command of a Coast Guard-certified captain. Nautical Tours' Hydra-Terras will also have ultra-clean diesel engines, among many environmental features, and multilingual tour narration. Because the Hydra-Terra is fully enclosed and because tours will be narrated on headphones, Nautical Tours' tour narration will not be audible to anyone who is not on board, thereby reducing the noise level for residents and others along the tour route.

4

14.    Plaintiff Nautical Tours intends to go into business with two Hydra-Terra amphibious vehicles, but has long-term plans for expansion that include operating as many sightseeing vehicles as public demand requires.

15.    Plaintiff Nautical Tours will also sponsor a community enrichment program for minority youth to promote entrepreneurship, professionalism, and musical appreciation.

### The Fight with Cambridge over a Jitney License

16.    Plaintiff Tyler has been trying to get Nautical Tours off the ground for seven years. He has been continuously hampered by the local governments.

17.    Plaintiff Tyler's first struggle was with the City of Cambridge over his jitney license. A jitney license is a general transportation license. Under Chapter 159A of the General Laws of Massachusetts, every transportation company in the state must have a jitney license. Generally, a jitney license certifies that its holder is experienced, properly capitalized, well insured, safe, and otherwise ready, willing and able to serve the public.

18.    Under Chapter 159A, a jitney license applicant must first apply to the licensing authority of the municipality where the applicant is based, which for Nautical Tours is Cambridge.

19.    Nautical Tours first applied to the Cambridge License Commission on December 13, 2003. Nautical Tours' original plan did not include a marine journey through Boston Harbor. Instead, the original plan was to conduct the marine portion of each journey on the Charles River. Under this original plan, Nautical Tours intended to use a boat ramp at the Museum of Science to access the Charles River. This ramp is

5

under the control of the Department of Conservation and Recreation ("DCR"), which is a state entity.

20.    During a public hearing on Nautical Tours' first license application, the Cambridge License Commission demanded that Nautical Tours secure written permission from the DCR to use the Charles River boat ramp at the Museum of Science before it would consider issuing him a jitney license.

21.    Plaintiff Tyler promptly called the DCR to arrange a meeting with the person responsible for the boat ramp. He eventually met with the head of construction for the DCR, who ensured Plaintiff Tyler that the DCR was willing to enter into a contract with Nautical Tours for the use of the boat ramp on the same terms as other users, including a different amphibious vehicle tour company. Yet, when Plaintiff Tyler repeatedly followed up over the next eight months in writing and in person, the DCR refused to take action and refused to explain why it was refusing to take action. The Plaintiffs were stymied.

22.    Confronted with the DCR's inexplicable stonewalling, Plaintiff Tyler made a strategic decision to alter his business plan. Rather than use the Charles River, Nautical Tours decided to conduct the marine portion of its tours in Boston Harbor. This was a feasible option because Hydra-Terra amphibious vehicles are Coast Guard-certified for open water voyages.

23.    Plaintiff Tyler then went back to the Cambridge License Commission with his new plan to use Boston Harbor. Rather than decide his pending application, the Commission demanded a new license application fee. The Commission did not explain why this new fee was required or even ask for any new information. As far as Plaintiff

6

Tyler could determine, it was just a naked demand for 150 dollars. On December 29, 2004, Plaintiff Nautical Tours paid the application fee again, in effect applying for the same jitney license a second time.

24.    The Cambridge License Commission denied Plaintiff Nautical Tours' second jitney license application on February 1, 2005. The main reason the Commission cited was its apparent determination, on the basis of no discernable evidence, that Cambridge did not need another tour company.

25.    Plaintiff Tyler and his supporters then devoted a year to trying to plead their case to the Cambridge City Council and its individual members. Eventually, on May 24, 2006, Nautical Tours signed up to speak during the time reserved for citizens to bring matters to the attention of the City Council during an open meeting. The Nautical Tours team prepared a carefully rehearsed presentation to ensure that they could make their best case within the five minute time slot they had.

26.    When it came time for the Nautical Tours team to speak, the City Council deliberately skipped over them and moved to the next speaker. Nautical Tours was only given its chance to speak when Council Member Diane Simmons, a Nautical Tours supporter, insisted that they be allowed to petition the government. Yet, even as the Nautical Tours team made its presentation, most of the Council Members ignored them and spoke among themselves.

27.    Cambridge's treatment of Nautical Tours, and Plaintiff Tyler's tireless efforts to realize his dream, led to a May 28, 2006 Boston Globe story on the company.

28.    After it became obvious that the Cambridge City Council had no intention of overruling the Cambridge License Commission, Nautical Tours pursued its statutory

right of appeal under Chapter 159A to the Massachusetts Department of Public Utilities ("DPU") on May 10, 2006. On July 14, 2006, the DPU denied Nautical Tours' appeal because the statute of limitations had run.

29.    On July 31, 2006, Plaintiff Nautical Tours applied to the Cambridge License Commission for a jitney license for the third time. Not long after the application was filed, the Commission informed Nautical Tours that it would not consider the application unless Nautical Tours filed additional documents that the Commission's own application procedures did not require. Then, the Commission informed Nautical Tours that it did not plan to render a decision within the timeframe specified by Chapter 159A and Cambridge ordinances. This was disastrous for Nautical Tours because it threatened to cause a serious jurisdictional problem for Nautical Tours if it needed to appeal again to the DPU. Ultimately, the Commission rendered a timely decision only because Nautical Tours' counsel forcefully expressed Nautical Tours' view that Cambridge's arbitrary departures from statutory and municipal procedures presented a glaring due process problem.

30.    On September 21, 2006, the Cambridge License Commission denied Nautical Tours' third application, again on the ground that the public does not need Nautical Tours' services. In rendering a decision, the Commission also admonished Plaintiff Tyler to buy his vehicles, rent his office space, and hire his employees before applying again. The Commission did not seem to care that no rational businessperson could possibly justify this enormous capital investment on the mere hope that the Commission would one day change its mind and decide that Nautical Tours was

"needed" after all. Nautical Tours understood the Commission's message to be "go away and don't come back."

31.    Plaintiff Nautical Tours pursued a timely appeal to the DPU. The DPU held a public hearing on the merits of Nautical Tours' appeal, engaged in its own discovery, allowed Nautical Tours to engage in discovery, and received briefing from Nautical Tours.

32.    Despite the City of Cambridge's insistence in three license denials that Nautical Tours must not be permitted to go into business, Cambridge did not ever bother to send a representative to the DPU's public hearing, much less file an appearance and formally oppose Nautical Tours' appeal.

33.    On June 1, 2007, the DPU overruled Cambridge and granted Plaintiff Nautical Tours a jitney license for its proposed service. This license certifies that Nautical Tours is ready, willing, and able to carry passengers along a fixed route in Massachusetts, including the streets of Boston.

### Boston Now Stands in the Way

34.    After receiving its jitney license from the state, Plaintiff Nautical Tours expected to be able to launch its business quickly.

35.    To fulfill a condition of its jitney license, Plaintiff Nautical Tours needed to verify that Boston would not require Nautical Tours to obtain a municipal "sightseeing" license under Chapter 399 of the Massachusetts Acts of 1931 for each vehicle the Plaintiffs intend to operate. The purpose of Chapter 399 is to give the Boston Police Commissioner the authority to regulate sightseeing vehicles that will originate in Boston and sightseeing vehicles that will stop in Boston at designated parking stands.

36.    Plaintiff Nautical Tours was confident that Defendants would not enforce Chapter 399 against it because Nautical Tours would neither originate its tours in Boston nor stop in the city. Nautical Tours' research indicated that sightseeing vehicles from outside Boston routinely enter the city. For example, Defendants have established special parking areas for out-of-town sightseeing vehicles that want to stop in Boston, but do not have municipal sightseeing licenses. Defendants are required to allow out-of-state vehicles into Boston without a sightseeing license because discriminating against them would violate the Dormant Commerce Clause. These parking areas are in less convenient locations than the parking areas for the licensed sightseeing vehicles. Because Boston easily accommodates these vehicles, which actually stop and park in the city, Boston should not have a problem with Nautical Tours' vehicles, which will not even stop.

37.    Second, Defendants—as a matter of policy or custom—routinely allow sightseeing vehicles from outside Boston, but originating within Massachusetts from places such as Cape Cod, to enter the city and use the parking areas for unlicensed vehicles. Nautical Tours' vehicles are no different than these sorts of vehicles which originate in-state.

38.    Finally, Nautical Tours is fundamentally different from other sightseeing vehicles in that Nautical Tours will not even stop in Boston. In fact, in 2004, Captain Tierney of the Boston Police Department stated during a City Council meeting that Boston had no interest in enforcing its sightseeing license requirement against sightseeing vehicles that do not stop in the city.

39.    Based on the harmless use of Boston's streets by sightseeing vehicles without municipal sightseeing licenses, and based on Captain Tierney's representations,

10

Plaintiff Nautical Tours did not expect Defendants to take the position that they would require Nautical Tours to have a license simply to pass though the streets of Boston without stopping.

40.    Defendants, however, have specifically told Plaintiff Tyler on many occasions since March 2007 that Nautical Tours does need a municipal sightseeing license. Defendants have also specifically and expressly told Plaintiff Tyler and his counsel on many occasions since March 2007 that Defendants will not even consider issuing Nautical Tours, nor any other sightseeing company, a new sightseeing license because there is a "moratorium" on new sightseeing licenses.

41.    In fact, Defendants have no publicly available application documents, fees or procedures for new sightseeing licenses. The only policy Defendants have with respect to new sightseeing licenses is that Defendants will not grant one to anyone or any company, including, specifically, Plaintiff Tyler and Plaintiff Nautical Tours. Plaintiffs have specifically asked Defendants' decision-makers if the former could apply for a new sightseeing license and Defendants have expressly refused to accept an application. Plaintiffs have resorted to litigation only after exhausting every possible avenue of acquiring a sightseeing license directly from Defendants and any further efforts along this line would be futile.

42.    A sightseeing license denial under Chapter 399 does not provide for any administrative right of appeal to the Massachusetts Department of Public Utilities or any other state agency. Plaintiffs, therefore, do not have the option of pursuing any administrative remedy with the state in the same fashion that they successfully pursued a

statutory right of administrative appeal to the DPU from the City of Cambridge's Chapter 159A jitney license denial.

### The Moratorium

43.   In 1995, Defendants instituted a total moratorium on issuing new sightseeing licenses, ostensibly to address anticipated traffic problems during the civil engineering project known as the Big Dig. The moratorium is an official policy or custom. The moratorium supposedly froze the number of sightseeing licenses in circulation to their 1995 levels.

44.   This does not seem to be the case, however. On April 1, 2008, Plaintiff Nautical Tours, through counsel, made a request to Defendants under the Massachusetts Public Records Law for copies of sightseeing licenses for the last twenty years. Defendants partially complied, supplying copies of licenses from 2000 to 2008. According to these records, there were 96 sightseeing licenses in circulation in 2000. By 2008, their number increased by eleven to 107.

45.   On information and belief, these eleven new licenses were distributed to existing license-holders in violation of the moratorium. The public was never informed that these new licenses would be created, and entrepreneurs like Plaintiff Tyler were never given an opportunity to apply for them. Defendants have never admitted that the number of licenses has increased. Defendants have always maintained that there is a moratorium on issuing new licenses, and since March 2007 always maintained that the moratorium applies to Nautical Tours.

46. According to public records produced by Defendants, seven companies control all 107 licenses. Two of these companies control nearly half the licenses, with 24 each.

47. With the moratorium in place, the only way for a prospective market entrant to acquire a sightseeing license is to purchase one from an existing license-holder. On information and belief, sightseeing licenses are bought and sold much like taxi licenses for at least tens of thousands of dollars each, and perhaps much more. There are no licenses currently for sale, and even if there were, their soaring cost, which is a function of government-created scarcity, would be prohibitive for Plaintiffs.

48. Defendant City of Boston's moratorium on issuing new sightseeing licenses remains in place even though the streets of the Big Dig opened years ago. Most of the Big Dig's streets opened to the public in January 2003. By 2004, the Big Dig had reduced travel times along the downtown I-93 segment, the airport tunnels, and the Storrow Drive connector to 13,800 hours of vehicle travel time per day from the 1995 rate of 38,200 hours per day. Travel time on I-93 North through Boston had been slashed by 86 percent. On January 13, 2006, every single street created by the Big Dig was open to traffic. Nevertheless, more than three years later, the moratorium on sightseeing licenses remains.

49. The moratorium is obsolete because its purported purpose—to regulate traffic during the Big Dig—has been achieved and is no longer relevant.

50. On information and belief, the primary reason the moratorium remains in place is to protect existing sightseeing license-holders from competition by new market entrants.

13

51.    On information and belief, Defendants have an official policy or custom of allowing sightseeing vehicles originating from outside metropolitan Boston, but nevertheless from within the state from places such as Cape Cod, into Boston without a municipal sightseeing license. Defendants allow these in-state sightseeing vehicles to use the same designated parking areas as the out-of-state sightseeing vehicles, and these in-state sightseeing vehicles are allowed to pick up or drop off passengers in Boston.

52.    On information and belief, Defendants only enforce the sightseeing license scheme against sightseeing companies based in the city of Boston and sightseeing companies based outside of Boston proper but within metropolitan Boston. In recent years, for example, Boston has enforced its sightseeing license requirement against a Cambridge-based double-decker tour bus company that formerly drove through Boston without stopping.

53.    On information and belief, the purpose of enforcing the sightseeing license scheme only against sightseeing companies based outside Boston but within metropolitan Boston is to shield Boston-based companies from competition by interfering with the rights of entrepreneurs like Plaintiff Tyler to earn an honest living and to travel.

## Federal Seaports and Federal Navigable Waterways

54.    Plaintiffs intend to conduct the marine portion of their journey in the federal seaport of Boston Harbor.

55.    The waters of Boston Harbor are federal navigable waterways.

56.    Plaintiffs intend to access Boston Harbor via a public boat ramp on the Little Mystic Channel in Boston. The Little Mystic Channel is a federal navigable waterway.

14

57.   Any other waters Plaintiffs use to reach Boston Harbor from the Little Mystic Channel are federal navigable waterways.

58.   Boston Harbor is not feasibly accessible to Nautical Tours vehicles from any location outside the city of Boston.

59.   Before Nautical Tours opens for business, its vessels and crew will be certified by the U.S. Coast Guard.

## INJURY TO PLAINTIFFS

60.   As a direct result of Defendants enforcement of Chapter 399 of the Act of 1931 against them, Plaintiffs are not able to open their business and participate in Boston's lucrative tourism market.

61.   Because they cannot go into business, the Plaintiffs have suffered, and continue to suffer, significant economic and non-economic harm as a result of the denial of their rights.

## CLAIMS

### Count One

Privileges or Immunities: Access to Federal Seaports and Federal Navigable Waterways

62.   Plaintiffs Tyler and Nautical Tours incorporate and re-allege each and every allegation in paragraphs 1 through 61 of this Complaint as though fully set forth herein.

63.   Count One is brought pursuant to the Privileges or Immunities Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983. The Privileges or Immunities Clause includes a right of access to federal seaports and use of federal navigable waterways.

64.    Plaintiffs Tyler and Nautical Tours want to drive amphibious vehicles into Boston from Cambridge, and proceed through Boston on its public streets to enter the federal navigable waterway and federal seaport of Boston Harbor via the federal navigable waterway of the Little Mystic Channel, which is within Boston.

65.    Plaintiffs Tyler and Nautical Tours will not stop in Boston for the purpose of dropping off or picking up passengers.

66.    The Privileges or Immunities Clause of the Fourteenth Amendment does not allow Boston to abridge the Plaintiffs' right to access federal seaports and use federal navigable waterways absent a sufficient legal justification.

67.    Plaintiffs have been denied their right to access federal seaports and federal navigable waterways because there is no justification for requiring the Plaintiffs to possess a municipal sightseeing license to pass through Boston's public streets without stopping en route to navigable waterways.

68.    Plaintiffs have been harmed, and continue to be harmed, by the enforcement of Boston's sightseeing license scheme against them.

## Count Two

### Privileges or Immunities: Intrastate Travel

69.    Plaintiffs Tyler and Nautical Tours incorporate and re-allege each and every allegation in paragraphs 1 through 61 of this Complaint as though fully set forth herein.

70.    Count Two is brought pursuant to the Privileges or Immunities Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983. The Privileges or Immunities Clause includes a right of intrastate travel for economic purposes.

16

71.    The Privileges or Immunities Clause of the Fourteenth Amendment does not allow Boston to abridge the Plaintiffs' right to intrastate travel without sufficient legal justification.

72.    The Plaintiffs have been denied their right of intrastate travel because there is no justification for requiring a vehicle to have a sightseeing license simply to pass through Boston on its public streets without stopping.

73.    Plaintiffs have been harmed, and continue to be harmed, by the enforcement of Boston's sightseeing license requirement against them.

**Count Three**

Due Process: Intrastate Travel

74.    Plaintiffs Tyler and Nautical Tours incorporate and re-allege each and every allegation in paragraphs 1 through 61 of this Complaint as though fully set forth herein.

75.    Count Three is brought pursuant to the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983. The Due Process Clause includes a right of intrastate travel for economic purposes.

76.    Plaintiffs have been denied their right of intrastate travel because the Due Process Clause of the Fourteenth Amendment does not allow Defendants to categorically bar Plaintiffs from travelling through the City of Boston.

77.    Plaintiffs have been harmed, and continue to be harmed, by the enforcement of Boston's sightseeing license requirement against them.

## Count Four

### Due Process: Right to Earn an Honest Living

78.    Plaintiffs Tyler and Nautical Tours incorporate and re-allege each and every allegation in paragraphs 1 through 61 of this Complaint as though fully set forth herein.

79.    Count Four is brought pursuant to the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983. The Due Process Clause includes the right to earn an honest living in any lawful occupation without unreasonable government interference.

80.    Defendants' refusal to allow Nautical Tours to operate in the city without a municipal sightseeing license (or, in the alternative, Defendants' refusal to grant a sightseeing license) deprives the Plaintiffs of their right to earn an honest living because Boston's actions are not rationally related to a legitimate government interest.

81.    Plaintiffs have been harmed, and continue to be harmed, by the enforcement of Boston's sightseeing license requirement against them.

## Count Five

### Due Process: Moratorium

82.    Plaintiffs Tyler and Nautical Tours incorporate and re-allege each and every allegation in paragraphs 1 through 61 of this Complaint as though fully set forth herein.

83.    Count Five is brought pursuant to the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983. The Due Process Clause includes the right to earn an honest living in any lawful occupation without unreasonable government interference.

18

84.   Defendants prohibit Nautical Tours from using the public streets of Boston without a sightseeing license, which the City will not grant because of the moratorium. The ostensible purpose of the sightseeing license moratorium was to address the unique traffic conditions created by the Big Dig.

85.   One hundred percent of the streets created by the Big Dig were open to the public by January 2006. The new streets of the Big Dig significantly altered downtown Boston traffic patterns from what they were in 1995 when the Big Dig began.

86.   The moratorium violates Plaintiffs' right to earn an honest living because the purported rational basis for the moratorium, if ever there was one, no longer exists due to changed circumstances.

87.   Plaintiffs have been harmed, and continue to be harmed, by the enforcement of Boston's sightseeing license requirement.

### Count Six

Due Process: Protectionism

88.   Plaintiffs Tyler and Nautical Tours incorporate and re-allege each and every allegation in paragraphs 1 through 61 of this Complaint as though fully set forth herein.

89.   Count Six is brought pursuant to the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983. The Due Process Clause includes the right to earn an honest living in any lawful occupation without unreasonable government interference.

90.   As set forth in Chapter 399 of the Massachusetts Acts of 1931, Defendants determine whether a sightseeing license should issue. Shielding existing companies from

19

competition is the reason behind the Defendants' policy of continuing the moratorium long after the Big Dig has ended.

91.    Defendants' refusal to issue new sightseeing licenses in order to shield existing sightseeing licensees from competition violates the Plaintiffs right to earn an honest living because the government has no legitimate interest in suppressing economic competition simply to enrich existing licensees at the expense of entrepreneurs and the public, which pays higher prices and receives lower quality and less-diverse services.

92.    Plaintiffs have been harmed, and continue to be harmed, by the enforcement of Boston's sightseeing license requirement.

### Count Seven

Equal Protection: Nautical Tours' Vehicles Are the Same as Any Other Vehicle

93.    Plaintiffs Tyler and Nautical Tours incorporate and re-allege each and every allegation in paragraphs 1 through 61 of this Complaint as though fully set forth herein.

94.    Count Seven is brought pursuant to the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983.

95.    Because they do not intend to stop in Boston, Plaintiff Nautical Tours' vehicles are not materially different than the countless private and commercial vehicles that pass through the city everyday without having to acquire a sightseeing license.

96.    Defendants' refusal to allow Plaintiff Nautical Tours to operate in the city without a municipal sightseeing license (or, in the alternative, Defendants' refusal to grant a sightseeing license) deprives Plaintiffs of the equal protection of the laws because treating Nautical Tours differently than the countless other private and commercial

20

vehicles that drive on the streets of Boston is not rationally related to a legitimate government interest.

97.   Plaintiffs have been harmed, and continue to be harmed, by the enforcement of Boston's sightseeing license requirement against them.

### Count Eight

Equal Protection: Selective Enforcement

98.   Plaintiffs Tyler and Nautical Tours incorporate and re-allege each and every allegation in paragraphs 1 through 61 of this Complaint as though fully set forth herein.

99.   Count Eight is brought pursuant to the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983.

100.   As a matter of policy or custom, Defendants enforce their sightseeing license requirement on a selective basis.  The Boston Police Department does not enforce the sightseeing license requirement against non-Boston-based tour services that enter Boston but originate from outside the metropolitan Boston area.

101.   As a matter of policy or custom, Defendants do, however, enforce their sightseeing license requirement against tour services like Nautical Tours, which originate outside the city of Boston itself, but within metropolitan Boston in places like Cambridge, Massachusetts.  Defendants selectively enforce the sightseeing license requirement for the purpose of denying the right to earn an honest living to metropolitan-area entrepreneurs like Plaintiff Tyler who will compete in the same regional market with the possessors of Boston's sightseeing licenses.

102.   Defendants' selective enforcement denies Plaintiffs the equal protection of the laws because Defendants are treating Plaintiffs differently from similarly situated

21

entities for the purpose of suppressing Plaintiffs' rights to earn an honest living and to travel.

103.  Plaintiffs have been harmed, and continue to be harmed, by the enforcement of Boston's sightseeing license requirement against them.

### Count Nine

Statutory Interpretation: Chapter 399 of the Acts of 1931.

104.  Plaintiffs Tyler and Nautical Tours incorporate and re-allege each and every allegation in paragraphs 1 through 61 of this Complaint as though fully set forth herein.

105.  Chapter 399 of the Acts of 1931 authorizes the Defendant Boston Police Commissioner to issue municipal sightseeing licenses.

106.  Defendants' application of Chapter 399 of the Acts of 1931 to the Plaintiffs is unlawful because the statute does not apply to the Plaintiffs.  The purpose of the statute is to regulate vehicles that will either occupy designated sightseeing vehicle stands within Boston or sightseeing vehicles whose journeys will originate in Boston.

107.  Plaintiffs have been harmed, and continue to be harmed, by the enforcement of Boston's sightseeing license requirement against them.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief as follows:

A.    Entry of final judgment declaring that Boston's enforcement of Chapter 399 of the Acts of 1931 violates the U.S. Constitution.

B.    A permanent injunction forbidding further enforcement of Boston's sightseeing license scheme.

22

C.    A permanent injunction against the moratorium and/or its arbitrary

prohibition on issuing new sightseeing licenses.

D.    An award of attorneys' fees, costs, and expenses under 42 U.S.C. Section

1988.

E.    For such further and equitable relief as the Court deems just and proper.

F.    An award of ten dollars in nominal damages.

G.    Plaintiffs request a trial by jury.

DATED this _12th_ day of February, 2009

Respectfully submitted,

ROBINSON & COLE L.L.P.                      INSTITUTE FOR JUSTICE

_Wystan M. Ackerman_
Wystan M. Ackerman, BBO #651086             Jeff Rowes
ROBINSON & COLE L.L.P.                       (NY Bar No. 4211991)*
280 Trumbull Street                          William H. Mellor
Hartford, CT 06103-3597                      (DC Bar No. 462072)*
Tel: (860) 275-8200                          901 North Glebe Road,
Fax: (860) 275-8299                          Suite 900
Email: wackerman@rc.com                      Arlington, Virginia 22203
*Local counsel for Plaintiffs*               Tel: (703) 682-9320
                                             Fax: (703) 682-9321
                                             Email: jrowes@ij.org; wmellor@ij.org
                                             *Motions for Admission *Pro Hac Vice*
                                             Pending
                                             *Attorneys for Plaintiffs*

23